IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2004

## STATE OF TENNESSEE v. STEPHEN KEITH FRAZIER

**Direct Appeal from the Circuit Court for Hardin County
No. 8198      C. Creed McGinley, Judge**

**No. W2003-01612-CCA-R3-CD  - Filed June 29, 2004**

A Hardin County jury convicted the Defendant, Stephen Keith Frazier, of vehicular homicide and two counts of driving while under the influence of an intoxicant or drug ("DUI").  The trial court merged the two DUI convictions and sentenced the Defendant to ten years for vehicular homicide, and eleven months and twenty-nine days for the DUI conviction, with both sentences to run concurrently.  On appeal, the Defendant contends that: (1) the evidence was insufficient to support the convictions; and (2) the trial court erred in sentencing the Defendant by improperly applying enhancement factor (17) to increase the length of the sentence and in not imposing alternative sentencing.  Based upon our review, we affirm the conviction for vehicular homicide and vacate the conviction for DUI, this offense being merged into the conviction for vehicular homicide.  Additionally, we affirm the Defendant's sentence for his vehicular homicide conviction, and we vacate the Defendant's sentence for his DUI conviction.  We therefore remand to the trial court for the entry of a single judgment in accordance with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court
Affirmed in Part; Reversed in Part; and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Richard W. DeBerry, Savannah, Tennessee, for the appellant, Stephen Keith Frazier.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; G. Robert Radford, District Attorney General; John Overton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a one-car accident that occurred on the afternoon of June 26, 2002, in

which the victim, Bobby F. Franks, died. When rescuers responded to the accident near U.S. Highway 64 in Hardin County, they found the victim trapped in the front passenger's seat of a white, 1981 Chevrolet Impala and the Defendant similarly confined in the driver's seat. Tests indicated that the Defendant's blood alcohol level was 0.22 and that his blood contained traces of marijuana. The Hardin County Grand Jury indicted the Defendant for two counts of aggravated vehicular homicide and two counts of DUI. The trial court granted the State's motion to amend the first count in the indictment to vehicular homicide. The Defendant was tried April 7, 2003, and the jury found him guilty of vehicular homicide and both counts of DUI. The trial court merged the two DUI convictions. The trial court sentenced the Defendant to ten years in prison, with license revocation for three years, for the vehicular homicide conviction and to eleven months and twenty-nine days in jail, with license revocation for one year, for the DUI conviction. The trial court ordered that the sentences run concurrently. The Defendant now appeals.

## A. Trial

The following evidence was presented at the Defendant's trial. Charles Weeks, then a seventeen-year-old Oklahoma resident visiting family in Hardin County, testified that, as he drove along U.S. Highway 64 from on June 26, 2002, he noticed a car in his rear-view mirror gaining on him as it rounded a corner, and it eventually passed him. Weeks estimated that the vehicle was moving at eighty or ninety miles per hour. Although he could not see the driver, Weeks explained that he saw a man with no shirt drinking a can of beer in the front passenger's seat of the car.

Weeks said that he watched the car continue down the highway, and he saw the car drift into the left, oncoming lane of traffic. He stated that, after the car's driver swerved right to avoid a potential accident, the car briefly returned to the right lane before it ran off the road, collided with a home driveway culvert,[1] and flipped over. Weeks explained that he stopped his car and exited to check on the accident, and he saw the victim, who was in the passenger's seat, lying toward the driver with his feet out the windshield. He recounted that the accident occurred between 5:00 and 5:30 p.m. He stated that he saw beer cans on the floorboard and a box of Natural Ice beer inside the car and noticed that neither person was wearing a safety belt. Weeks said that he was unable to do anything to help either the victim, who sounded as though he was "choking on his own blood," or the driver, who was unable to move, so he went to a nearby house to call for assistance.

On cross-examination, Weeks testified that, on the day following the accident, he told Mark Stanfill of the Tennessee Highway Patrol that he did not get a look at the passenger or the driver of the car as it passed him. On re-direct examination, Weeks stated that he remembered the incident better at trial than the day after it happened.

---

[1]A sewer or drain crossing under a road.

Amy Brasher,[2] an off-duty emergency medical technician ("EMT"), testified that she and two other off-duty EMTs spotted the roadside accident as they returned from a nearby lake. Amy Brasher stated that she and fellow EMT Timbo White tended to the injured driver, while her husband Jeff Brasher, who is also an EMT, treated the passenger. She testified that their efforts to remove the Defendant from the car were unsuccessful because of the vehicle's damage. She recounted that the Defendant was breathing, but he had sustained a deep laceration to his arm with a possible broken bone and a possible head injury. She described his position: "[H]e was kind of slumped down between the seat and the steering wheel with his head on the seat of the car. . . ." Amy Brasher stated that she tried to keep the Defendant awake by talking with him, as he drifted in and out of consciousness. She recounted that White went through the back of the car to place a C-spine[3] on the Defendant to keep his neck straight until outside assistance could extricate him from the driver's seat. She testified that, although she did not recall seeing any beer cans, the car had a strong smell of alcohol. She stated that the Defendant was wearing jeans and a short-sleeve button-down shirt, and the victim wore jeans but no shirt. Amy Brasher testified that on-duty EMTs who arrived later needed the "jaws of life" to remove the outer driver's side door. She recounted that, after they removed the Defendant from the wreckage, they put the Defendant on a spine board and placed a C-collar on him before taking him to the ambulance.

Jeff Brasher testified that he examined the victim while his wife Amy Brasher and Timbo White checked the driver. He explained that he grabbed the victim's neck as part of a C-spine control procedure to stabilize the injured person and assess his pulse. He stated that the pulse was "very weak and very thready," and the victim had "agonal respirations."[4] He testified that the victim died within "a minute or two" of their arrival. Jeff Brasher stated that the victim was "slumped over in the seat and his left leg was underneath the dash[board] on the passenger side . . . in a confined space." He said that he could not remove the victim from the car once the victim's pulse disappeared because the victim wore nothing that he could leverage for pulling. He estimated that the victim would have died even if he had been near immediate surgical assistance. Jeff Brasher said that he told the paramedics, who later arrived at the scene, to concentrate on the driver because the passenger had died. He said that he saw Natural Ice beer cans in the car, and he noted that only two people were in the car when he reached the scene.

Jimmy Lambert, a trooper with the Tennessee Highway Patrol, testified that he responded to a dispatch at 5:32 p.m. on June 26, 2002, and arrived at the scene after medical personnel had

---

[2]Amy Brasher went by the name "Amy Peckam" on June 26, 2002. She subsequently married Jeff Brasher and assumed his last name.

[3]Amy Brasher described a C-spine as a procedure "to keep your neck as straight as you possibly can so you don't have any further injuries to your neck or spine." Jeff Brasher noted that the procedure also enables pulse monitoring.

[4]Amy Brasher explained that this condition occurs when "fluid or blood is in the way of [the] passage of air." Jeff Brasher noted that he diagnosed the victim as having agonal respirations because the victim was "breathing about once every fifteen seconds."

placed the Defendant in the ambulance. Trooper Lambert stated that he saw several beer cans around the car as he marked off the vehicle. He said that medical personnel informed him that the victim had died. He recounted that the ambulance took both of the car's occupants to the hospital. The trooper explained that he went to the hospital to obtain blood samples from the Defendant and the victim. He stated that, while he was at the hospital, a Criminal Incident Response Team was contacted to reconstruct the accident and ascertain the respective positions of the Defendant and the victim in the car.

On cross-examination, the trooper said that most of his investigative work, including photography and measurements, occurred the day after the incident. Trooper Lambert stated that the car had already been moved to a salvage yard when the Criminal Incident Response Team arrived, and the unit visited the yard to take measurements.

Keith Amos, a deputy with the Hardin County Sheriff's Department, testified that he received a dispatch to respond to a car accident with injuries on U.S. Highway 64. Deputy Amos stated that he was the first law enforcement officer to arrive on the scene, and, as he approached the wreckage, he saw EMTs administer first aid to the Defendant and victim. He stated that the damaged vehicle was beside the Old Country Store. The deputy testified that he called Central Dispatch to advise that the area was secure.

Max Anderson, a trooper with the Tennessee Highway Patrol, testified that he went to the scene as part of the Criminal Incident Response Team. The trooper said that the Defendant's car was traveling westward on U.S. 64 when it ran off the ten-foot shoulder along the side of the road. Trooper Anderson described the path of the vehicle driven by the Defendant:

> [T]here's tire markings where it went off the side [of the road] and just missed that mailbox and went here and hit that culvert [along the property's driveway]. As [the car] hit that culvert, it went airborne and landed some eighty feet over there in the grass, flipped over and hit some posts, and then came to rest.

He stated that, upon leaving the road, the Defendant's car traveled another two hundred and twenty feet and hit the culvert. The trooper noted that, from the tire tracks, he found no sign of "braking or any kind of hard steering maneuver," because such actions along the slick surface would have caused discernible sliding.

Trooper Anderson stated that, once the Defendant's car hit the culvert, the driver could do nothing to stop the car from flipping. He testified that the back axle, which had been dislodged by the collision with the culvert, hung on the culvert in a way that enabled the car to start "twisting." He explained that the crush point along the roof indicated that the car landed on the driver's side after going airborne from the collision with the culvert. The trooper stated that the car then bounced high enough in the second half of its rotation to hit a stake along the road with the right rear corner of the fender. Trooper Anderson explained that impact damage crushed the dashboard and pinned the Defendant in the driver's seat. He testified:

It looks like someone just slipped off of the right side of the roadway, didn't have any input into it. It's just like someone might have drifted off to sleep at the wheel or something. There was no interaction. There wasn't any hard steering. There wasn't any hard braking. The car hit the culvert at a hard lick, and after that, there was no control of it left. You just had to ride it out, so I show inattentiveness at the steering wheel, maybe possibly from intoxication or something like that or some reason why someone . . . just didn't show any quick reaction time like a normal driver would have.

He stated that no evidence at the scene indicated that the Defendant tried to correct or stop the car as it veered off the road.

Brian Lee Eaton, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory in Jackson, testified that his laboratory tested a sample of the Defendant's blood. Eaton explained that the Defendant's blood alcohol level was 0.22. He stated that the Defendant's hospital records indicated that the Defendant's blood contained both a Xanax-type, Schedule IV, drug and marijuana. On cross examination, Eaton stated that the report could not confirm when the Defendant had used marijuana, and the record did not indicate the amount of marijuana present. He estimated that a person using marijuana would test positive for the drug for two weeks after consumption.

The Defendant called Rayford Smith, who testified that he knew both the Defendant and the victim for most of their lives. He stated that he saw the Defendant and the victim around noon on the day of the accident. Smith said that, although he could not recall which car they occupied, he remembered that the victim was driving.

Randy McLin, who knew the Defendant and the victim, testified that the two visited his house in a Chevrolet Impala at 3:30 p.m. on the day of the accident. McLin stated that the victim was driving when they arrived. On cross examination, he testified that the Defendant and the victim had probably been drinking prior to arriving at his house and that the Defendant teased McLin's children. McLin stated that he asked the Defendant to go outside and to leave the house. He said that the Defendant came to see him, and he noticed that the Defendant was intoxicated. He stated that, a few weeks after the accident, the Defendant told him that the victim caused the accident by grabbing and yanking the steering wheel, which cause the car to veer into the culvert.

The Defendant testified that he had been friends with the victim for almost twenty years and close friends for the last four. The Defendant stated that he had been the victim's employer for approximately two-and-a-half years. The Defendant testified that, when he arrived at the victim's home on the morning of the accident, the victim had already been drinking, and the Defendant began consuming alcohol as well. The Defendant stated that they consumed two twelve-packs of beer. He explained that he could not remember most of what happened afterward, including whether he drove.

The Defendant stated that he would probably be handicapped for life. He explained that the injuries had affected him emotionally. He stated that after being in the hospital for a week, he

needed four or five months before he could move around freely. On cross-examination, the Defendant testified that he did not remember if he was driving when the accident occurred. He stated that the accident involved his car, which he had owned for approximately six months. The defendant testified that he had smoked marijuana a month before the accident occurred and consumed blue Xanax pills given to him by the victim on the morning before the accident.

The jury convicted the Defendant of vehicular homicide pursuant to Tennessee Code Annotated section 39-13-213 and both counts of driving under the influence pursuant to Tennessee Code Annotated sections 55-10-401(a)(1), (2). The trial court merged the two DUI counts.

## B. Sentencing Hearing

The following evidence was presented during the Defendant's sentencing hearing. The State introduced the Defendant's pre-sentence report into evidence. The trial court also admitted a victim impact statement completed by the victim's mother.

Chris Green testified that he had worked with the Defendant at Morning Star Manufacturing and that they attended the same church. Green stated that the Defendant had worked with the company for roughly six months, and, if the Defendant's health allowed, Morning Star Manufacturing would re-employ him. Green opined that under an alternative sentence, the Defendant could be successful in complying with the rules of probation and employment. The Defendant introduced medical records indicating that the his health was improving and that he still has future surgeries and medical appointments related to his injuries.

In determining the defendant's sentence, the trial court applied the following enhancement factors pursuant to Tennessee Code Annotated section 40-35-114 (1997 & Supp. 2002):

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; . . .
> (17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

The Defendant requested that the court apply a mitigating factor that he lacked any criminal intent in committing the crime. Tenn. Code Ann. § 40-35-113(8) (1997). The trial court found that this factor applied because the Defendant's intoxication may have prevented a sustained intent. The trial court then sentenced the Defendant to ten years for the vehicular homicide conviction and eleven months and twenty-nine days for the DUI conviction, with the sentences to run concurrently. The trial court also ordered a license revocation of three years for the vehicular homicide conviction and of one year for the DUI conviction.

## II. Analysis

On appeal, the Defendant contends the following: (1) the evidence was insufficient to support

the convictions; (2) the trial court erred in sentencing him; and (3) the trial court erred in not granting him probation.

## A. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial was insufficient for a rational trier of fact to find him guilty beyond a reasonable doubt. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of vehicular homicide and DUI. Although not raised by the Defendant, we agree with the State that double jeopardy principles will not permit the Defendant to be convicted of both vehicular homicide and DUI. State v. Derrick Williams, No. W1999-01231-CCA-R3-CD, 2000 WL 1229181, at *2 (Tenn. Crim. App., at Jackson, Aug. 18, 2000) (citing State v. Denton, 938 S.W.2d 373 (Tenn. 1996); State v. Rhodes, 917 S.W.2d 708 (Tenn. Crim. App. 1995), perm. app. denied (Tenn. 1996)). Accordingly, we remand the case to the trial court to vacate the judgment of the DUI conviction and for entry of a single judgment for vehicular homicide, with a notation that the DUI has been merged into the vehicular homicide conviction.

Tennessee Code Annotated § 39-13-213(a) (1997) defines vehicular homicide as follows:

(a) Vehicular homicide is the reckless killing of another by operation of an automobile, airplane, motorboat or other motor vehicle:
(1) As the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or
(2) As the proximate result of the driver's intoxication as set forth in § 55-10-401.

For the purposes of this section, "intoxication" includes both alcohol intoxication as defined by § 55-10-408, drug intoxication, or both.

Tennessee Code Annotated § 55-10-401(a) defines DUI as follows:

(a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:
(1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or
(2) The alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more.

Tennessee Code Annotated § 55-10-408(a) defines the presumption of intoxication as follows:

(a) For the purpose of proving a violation of § 55-10-401(a)(1), evidence that there was, at the time alleged, ten-hundredths of one percent (.10%) or more by weight of alcohol in the defendant's blood shall create a presumption that the defendant's ability to drive was sufficiently impaired thereby to constitute a violation of § 55-10-401(a)(1).

The Defendant argues that insufficient evidence exists to support his conviction of vehicular homicide because "Bobby Franks was the last person identified as driving the car." We disagree with the Defendant's assertion. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the essential elements of vehicular homicide beyond a reasonable doubt.

The evidence was undisputed that, on June 26, 2002, between 5:00 and 5:30 p.m., the Defendant lay trapped in the driver's side seat after his car crashed in Hardin County near U.S. Highway 64. The evidence showed that the Defendant was driving at the time of the accident. Several witnesses testified that the victim sat in the passenger's seat after the accident, and one saw the victim sitting in the passenger's seat moments before the accident. Two witnesses stated that the Defendant was pinned to the driver's seat and that the victim was similarly trapped on the front passenger's seat. The evidence showed that the victim died as a result of the accident. Further, the Defendant's blood alcohol level was 0.22 shortly after the accident, and the Defendant stated that he had consumed alcohol and Xanax before the accident. Accordingly, we conclude that sufficient evidence exists in the record to support the Defendant's vehicular homicide conviction. This issue is without merit.

-8-

## B. Sentencing

The Defendant contends that the trial court erred in sentencing him. The trial court imposed the following sentences: ten years for vehicular homicide; and eleven months and twenty-nine days for DUI, to be served concurrently with each other. Because we dismissed the DUI conviction, the Defendant's sentence for the DUI conviction is vacated, and we will only address his ten-year sentence for vehicular homicide. Specifically, the Defendant argues that the trial court erred in applying enhancement factor (17) and in not granting the Defendant's request for probation. The State agrees that the trial court erred by applying enhancement factor (17) but argues that enhancement factor (11) applies to this case along with enhancement factor (2). Thus, the State contends, the trial court properly sentenced the Defendant to ten years and denied the Defendant's request for probation. We agree with the State.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.

A defendant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). A defendant who is an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(b)(6). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated § 40-35-103(1) states that:

> Sentences involving confinement should be based on the following considerations: (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. . . ." Tenn. Code Ann. § 40-35-103(5). The trial court may consider enhancing and mitigating factors when determining a defendant's sentence. Tenn. Code Ann. §§ 40-35-114, -113.

In sentencing a defendant, the presumptive sentence for a Class B, C, D, or E defendant shall be the minimum sentence in the range if no enhancing or mitigating factors are present. Tenn. Code Ann. § 40-35-210(c). When such factors are present, "the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e).

In this case, after considering the evidence presented at the sentencing hearing, the trial court found that enhancement factors (2) and (17) applied to the Defendant's sentence pursuant to Tennessee Code Annotated section 40-35-114. The trial court also applied mitigating factor (8) to the Defendant's convictions pursuant to Tennessee Code Annotated section 40-35-113. The trial court then determined that the Defendant was a mid-range offender and sentenced him to ten years. The trial court found that the defendant was not eligible for probation because of the ten-year sentence.

The Defendant argues that the trial court erred by applying enhancement factor (17), and the State agrees. However, the State contends that enhancement factor (11), "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," applied to this case. Tenn. Code. Ann. § 40-35-114(11). Enhancement factor (17), "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great," may not be applied to a conviction for vehicular homicide by recklessness. State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995), *overruled on other grounds* by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000); see State v. Jimmy Wayne Perkey, No. E2002-00772-CCA-R3-CD, 2003 WL 21920255, at *3 (Tenn. Crim. App., at Knoxville, Aug. 12, 2003), *perm. app. denied* (Tenn. Dec. 22, 2003). After thoroughly reviewing the evidence presented at the sentencing hearing, we conclude that the trial court's basis for applying enhancement factor (17) instead applies to (11). See State v. Zonge, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997) (stating, "Even though inherent in the offense, factor [(11)] is applicable when there is a risk of harm to a person other than the victim").

Weeks testified that the Defendant was traveling between eighty and ninety miles per hour as he passed Weeks' car on U.S. Highway 64. Furthermore, Weeks stated that the Defendant drifted into the oncoming lane of traffic and had to turn rapidly to avoid hitting an oncoming car. From this rapid turn, the Defendant's car then ran off the road, hit the driveway culvert, and flipped. This evidence shows that the Defendant's conduct caused a risk of harm to a person other than the victim. Therefore, enhancement factor (11) applies to this case.

Although the State does not raise this issue, we conclude that the trial court erred by applying mitigating factor (8) because "the voluntary use of intoxicants does not fall within the purview of this factor." Tenn. Code. Ann. § 40-35-113(a). Based upon the application of enhancement factors (2) and (11), and no mitigating factors, we conclude that the Defendant's ten-year sentence is appropriate. We further conclude that the Defendant has not met his burden of demonstrating the impropriety of the trial court's denial of alternative sentencing, because the Defendant's ten-year sentence precludes him from receiving alternative sentencing. See Tenn. Code. Ann. § 40-35-303(a). This issue is without merit.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we AFFIRM the Defendant's judgment of conviction and sentence for vehicular homicide, and VACATE the Defendant's judgment of conviction and sentence for DUI, this conviction being merged into that for vehicular homicide. We REMAND the case to the trial court for entry of a single judgment of conviction for vehicular homicide, with a notation that the DUI has been merged into the vehicular homicide conviction.

_____
ROBERT W. WEDEMEYER, JUDGE